In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 15-3227

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT A. TATE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:14-cr-40073-JPG-1 — **J. Phil Gilbert**, *Judge.*

———————————

ARGUED FEBRUARY 23, 2016 — DECIDED MAY 18, 2016

———————————

Before WOOD, *Chief Judge*, and SYKES and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In this appeal, we address two sentencing issues. First, defendant Robert A. Tate challenges the district court's findings on the extent of his relevant conduct. Those findings were based on credibility determinations to which we give great deference, and we find no error. Second, we must also decide whether a conviction under an Illinois law that prohibits attempted procurement of anhydrous

ammonia with intent that it be used to manufacture methamphetamine qualifies as a "controlled substance offense" under the Sentencing Guidelines' career offender provision, U.S.S.G. § 4B1.1. Despite the conviction's significant link to methamphetamine manufacture, careful parsing of the relevant Guideline provisions shows that a conviction under this particular statute does not actually qualify. The district court will be free to consider the nature of the conviction when it exercise its sentencing discretion on remand, but it will need to do so without treating this defendant as a career offender under the Guidelines.

I.  *Relevant Conduct*

A jury found appellant Tate guilty of conspiring to manufacture methamphetamine between February 2013 and June 2014 and guilty on a single count of distribution in March 2014 stemming from a controlled buy. Tate does not challenge his convictions on appeal.

In applying the U.S. Sentencing Guidelines, a district court must determine the defendant's criminal history and offense level. Tate's criminal history category was VI, regardless of any issue under the career offender Guideline. The district court found that Tate's relevant conduct made him responsible for 400 grams of methamphetamine, yielding an adjusted offense level of 28. The court also found that Tate qualified as a career offender under the Guidelines, which raised his adjusted offense level to 32. The district court's guideline calculations produced a range of 210 to 262 months. The court sentenced Tate to 210 months in prison on each count, to be served concurrently.

The Sentencing Guidelines instruct district courts to base the offense level on the defendant's "relevant conduct," a calculation governed by § 1B1.3 of the Guidelines. In drug cases, the quantity of drugs for which the defendant is held responsible is "frequently the single most important determinant of the length of the defendant's sentence under the Guidelines." *United States v. Acosta*, 85 F.3d 275, 281–82 (7th Cir. 1996).

Tate's conviction for distribution of methamphetamine involved just 0.2 grams of methamphetamine, but at sentencing the district court held him responsible for an estimated 400 grams of methamphetamine. That quantity was based not on the single controlled buy but on the trial testimony of Tate's former girlfriend, Brandy Pierce, and a proffer statement by Denise Huston. Pierce testified that she had supplied Tate with precursor materials and allowed him to cook methamphetamine daily at her home over a period of several months. Huston reported that Tate had manufactured methamphetamine at her home at least twenty times during the preceding year.

At sentencing, Tate argued that Pierce and Huston were not sufficiently credible to support the 400-gram figure. Judge Gilbert rejected that argument. He acknowledged that the estimates were not exact but explained that in his experience, witnesses like Pierce and Huston could credibly testify as to whether someone was cooking methamphetamine "every day or every other day" and could reasonably estimate the drug quantities involved.

We review a district court's factual findings on drug quantity only for clear error, *United States v. Austin*, 806 F.3d 425, 430 (7th Cir. 2015), citing *United States v. Clark*, 538 F.3d 803, 812 (7th Cir. 2008), and we give substantial deference to the

sentencing court's determinations of witness credibility. *United States v. Blalock*, 321 F.3d 686, 690 (7th Cir. 2003); *United States v. Johnson*, 227 F.3d 807, 813 (7th Cir. 2000). "Determining how much of a particular drug a defendant possessed, over a lengthy period of time, is not an exact science." *United States v. Sewell*, 780 F.3d 839, 849 (7th Cir. 2015). As we have often explained, drug traffickers rarely keep reliable business records, and district courts determining relevant conduct may make reasonable estimates. See *Austin*, 806 F.3d at 431; *Sewell*, 780 F.3d at 849.

Pierce testified that Tate cooked methamphetamine at least once a day from January 2013 until October 2013, producing at least two grams with each "cook." The court's estimate of 360 grams was at the low end of the range her testimony could support. Tate argues primarily that Pierce could not be believed because of her prior convictions and her repeated attempts to minimize her own role in the conspiracy. Those circumstances are not unusual with witnesses who have been involved in drug-trafficking operations. They did not preclude the district court from finding that Pierce's testimony was reliable enough to support the estimate in the presentence report. See *United States v. Rodgers*, 245 F.3d 961, 968 (7th Cir. 2001) (The "district judge was free to credit Dexter. That Dexter was a convicted felon who stood to gain from his testimony against Rodgers is by no means a remarkable circumstance."). Pierce acknowledged participating in Tate's methamphetamine operation. While she denied helping cook the drug, she also testified that she bought precursor materials for Tate a "few times a week," that she allowed Tate to cook methamphetamine at her home, that she drove him to various locations to sell the drug, and that she crushed pills for Tate to use in cooks. The district court did not err in relying on

Pierce's testimony to hold Tate responsible for 360 grams of methamphetamine.

As for Denise Huston, Tate first argues that her proffer statement is inconsistent with her trial testimony. The second revised presentence report said that Huston saw Tate make methamphetamine at her house at least twenty times over the preceding year. At trial, however, Huston testified that Tate made methamphetamine at her house "[a]t least ten different times." The discrepancy, Tate argues, shows that Huston's recollections are vague and incredible. We disagree.

Discrepancies or inconsistent prior statements are of course relevant in assessing witness credibility, but they "do not, as a matter of law, render a witness's testimony incredible." *United States v. Hernandez*, 544 F.3d 743, 747 (7th Cir. 2008). Although Huston's story was not exact, determining drug quantities for sentencing purposes "is often difficult, and district courts may make reasonable though imprecise estimates based on information that has indicia of reliability." *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015). The district court found Huston and her estimates credible. In using the forty-gram figure, the court erred if at all on the low side. (Huston testified that Tate might use up to five boxes of pseudoephedrine pills per cook, which could yield ten grams per cook, or 100 to 200 grams total.) See *United States v. Acosta*, 534 F.3d 574, 584 (7th Cir. 2008) (finding no clear error in use of method to estimate drug quantity that erred on the low side). We see no clear error in this finding.

Tate also argues there was no nexus between the methamphetamine he made at Huston's residence and the conspiracy to manufacture of which he was convicted. We disagree. The methamphetamine he manufactured in those cooks is of

course "directly attributable to him." *Acosta*, 534 F.3d at 585, quoting *United States v. McLee*, 436 F.3d 751, 765 (7th Cir. 2006); see U.S.S.G. § 1B1.3(a)(1)(A). And it was not clear error for the district court to conclude that those drug quantities were part of the ongoing conspiracy to manufacture the drug. Huston testified that around the end of 2013 and beginning of 2014, within the charged time period of the conspiracy, Tate came to her home at least ten times to manufacture methamphetamine, that she would sometimes provide him with ingredients for his cook, and that Tate would sometimes pay her for allowing him to manufacture at her home. The district court's finding that those drugs were relevant conduct for purposes of the conspiracy was not clearly erroneous in light of this testimony. Accordingly, we see no basis for reversal on any of Tate's relevant conduct arguments.[1]

## II.  *Career Offender Enhancement*

Under the U.S. Sentencing Guidelines, an adult defendant is a career offender if he is convicted of a crime of violence or a controlled substance offense, and if he has at least two prior felony convictions for crimes of violence or controlled substance offenses. U.S.S.G. § 4B1.1(a). Tate was classified as a career offender based on two prior state court convictions: one for unlawful delivery of cocaine, and the other for attempted procurement of anhydrous ammonia with intent that it be used to manufacture methamphetamine. That finding raised

---

[1] Even if the district court had erred in using Huston's statements to determine relevant conduct, such an error would have been harmless. Without those forty grams, Tate's offense level would still have been based on more than 350 grams. See U.S.S.G. § 2D1.1(c)(6). See *United States v. Frith*, 461 F.3d 914, 918 (7th Cir. 2006) (error in calculating loss amount was harmless where defendant's "offense level remains the same").

his guideline range by about fifty percent. Tate argues on appeal as he did in the district court that the anhydrous ammonia conviction did not qualify as a "controlled substance offense."

Tate's argument presents a question of law that we review *de novo*. *United States v. Dyer*, 464 F.3d 741, 743 (7th Cir. 2006), citing *United States v. Hankton*, 432 F.3d 779, 795 (7th Cir. 2005). Under the career offender provisions, a "controlled substance offense" is defined as "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). The definition includes "aiding and abetting, conspiring, and attempting to commit such offenses," U.S.S.G. § 4B1.2 cmt. n.1, so it does not matter that Tate's anhydrous ammonia conviction was for attempted procurement.

The Illinois law under which Tate was convicted provides in relevant part:

> It is unlawful to knowingly engage in the possession, procurement, transportation, storage, or delivery of anhydrous ammonia or to attempt to engage in any of these activities or to assist another in engaging in any of these activities with the intent that the anhydrous ammonia be used to manufacture methamphetamine.

720 Ill. Comp. Stat. 646/25(a)(1). Violation of the statute is a Class 1 felony under Illinois law, 720 Ill. Comp. Stat. 646/25(a)(2), punishable by between four and fifteen years of imprisonment. See 730 Ill. Comp. Stat. 5/5-4.5-30(a).

Tate's conviction for attempted possession of anhydrous ammonia with intent to manufacture methamphetamine did not involve the actual "possession of a controlled substance," so the latter portion of § 4B1.2(b) does not apply. See *Dyer*, 464 F.3d at 743 (defendant's possession of pseudoephedrine was not possession of a controlled substance, making "the last portion of § 4B1.2(b) inapplicable"). Nor on its face does the Illinois statute of Tate's conviction prohibit the "manufacture, import, export, distribution, or dispensing *of a controlled substance*."

So far, then, the anhydrous ammonia conviction does not satisfy the guideline definition of a controlled substance offense. But § 4B1.2 also includes a relevant application note, which is binding "'unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of' that Guideline." *Dyer*, 464 F.3d at 743, quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993). Application Note 1 to § 4B1.2 reads in relevant part: "Unlawfully possessing a listed chemical with intent to manufacture a controlled substance (21 U.S.C. § 841(c)(1)) is a 'controlled substance offense.'"

In *United States v. Dyer*, we considered the effect of that note on the definition of "controlled substance offense." Dyer argued that his conviction for possession of pseudoephedrine with intent to manufacture methamphetamine did not qualify as a controlled substance offense under a strict reading of the

Guidelines because he had not been convicted of *actually man-ufacturing* a controlled substance. 464 F.3d at 743. We recognized that the argument "had some appeal" before a 1997 amendment to the Guidelines. *Id.* But the 1997 amendment added the application note to bar that approach. In adopting the amendment, the Sentencing Commission explained that "there is such a close connection between possession of a listed chemical … with intent to manufacture a controlled substance and actually manufacturing a controlled substance that the former offense [… is] fairly considered as [a] controlled substance trafficking offense[]." *Id.* (alterations in original), quoting U.S.S.G. app. C, amend. 568. Pseudoephedrine is a "listed chemical," see 21 U.S.C. § 802(33), (34)(K), so we affirmed Dyer's career offender designation.

If anhydrous ammonia were a listed chemical as well, this would be a simple case controlled by *Dyer*, and Tate's argument would fail. However, "listed chemical" has a particular meaning within Title 21, Chapter 13, Subchapter I of the United States Code. It includes "any list I chemical or any list II chemical." 21 U.S.C. § 802(33). List I and II chemicals are those specified by regulation of the Attorney General as chemicals used in manufacturing controlled substances unlawfully (list I chemicals are those specifically deemed "important to the manufacture of the controlled substances"), including the qualifying chemicals on the itemized lists in 21 U.S.C. § 802(34) and (35). Anhydrous ammonia is not included on either list.[2] Thus, Tate's anhydrous ammonia conviction is not a conviction for unlawfully "possessing a *listed*

---

[2] The regulations, like the statute, define listed chemical as "any List I chemical or List II chemical." 21 C.F.R. § 1300.02(b). List I and II chemicals

*chemical* with intent to manufacture a controlled substance." U.S.S.G. § 4B1.2 cmt. n.1 (emphasis added). Sticking closely to the text of the relevant statutes and the Guidelines, then, we must conclude that Tate's anhydrous ammonia conviction falls outside the scope of both the definition of "controlled substance offense" in § 4B1.2(b) and the application note.

The government argues that Tate's anhydrous ammonia conviction is so similar to offenses that do qualify as "controlled substance offenses" that it makes little sense as a matter of logic or policy to exclude it. For example, the application notes specify that unlawfully "possessing a prohibited flask or equipment with intent to manufacture a controlled substance (21 U.S.C. § 843(a)(6)) is a 'controlled substance offense.'" U.S.S.G. § 4B1.2 cmt. n.1. Possession of a prohibited flask with intent to manufacture would qualify as a controlled substance offense for the same reason that we held in *Dyer* that possession of a precursor "listed chemical" with intent to manufacture qualifies: the application notes explicitly say so.

The government's policy argument has considerable force. Anhydrous ammonia, which is used as an agricultural fertilizer, is also a key ingredient in one common method for producing methamphetamine, and the Illinois statute of Tate's conviction required intent to use the anhydrous ammonia to produce methamphetamine. Yet in parsing the applicable law, we cannot ignore the fact that the provisions are quite specific but do not mention anhydrous ammonia. It is not a "listed chemical," a "prohibited flask," or a piece of "equipment."

---

appear at 21 C.F.R. § 1310.02 of the regulations and include a few additional chemicals that do not appear in the statute, but anhydrous ammonia is not among them. See 21 C.F.R. § 1310.02(a), (b).

The Sentencing Commission has chosen to expand the definition of "controlled substance offense" to include only a limited set of offenses involving possession of some ingredients and equipment with intent to manufacture methamphetamine and other controlled substances. Based on the text of § 4B1.2 and its application notes, possession of an *unlisted* precursor chemical like anhydrous ammonia, even with intent to manufacture, does not qualify. Accord, *United States v. Walterman*, 343 F.3d 938, 940–42 (8th Cir. 2003) (possession of lithium with intent to manufacture methamphetamine is not a "controlled substance offense").

The government's policy arguments make intuitive sense, of course. Amendment 568 to the Guidelines resolved a circuit split as to whether convictions for possessing a listed chemical, a prohibited flask, or equipment with intent to manufacture a controlled substance qualified as controlled offenses. The Sentencing Commission said yes based on the "close connection" between possession of those items with intent to manufacture and actual manufacture of controlled substances. See U.S.S.G. app. C, amend. 568. It is not readily apparent why the Commission chose to distinguish between "listed chemicals" like pseudoephedrine and unlisted chemicals like anhydrous ammonia, both of which have legitimate uses but also are used to manufacture methamphetamine.

Whatever its reasons, the Commission provided quite specifically that possessing "a listed chemical" and "a prohibited flask or equipment" with intent to manufacture a controlled substance qualified as controlled substance offenses. If the Commission had intended to go further, to include unlisted chemicals as well, it could have used language to that effect

or it could have said that the specific offenses listed in the application notes were meant to be only examples. See *Walterman*, 343 F.3d at 941. It took neither step. The government's policy argument alone does not justify broadening the sweep of the career offender enhancement beyond the plain text.

Accordingly, the district court erred in concluding that Tate should be sentenced as a career offender. The effect on Tate's guideline range was substantial, raising it from 140–175 months to 210–262 months, with a final sentence of 210 months.

An error in calculating the Guideline range can still be harmless where the district judge makes clear that the sentence would have been the same absent the error. *United States v. Hill*, 645 F.3d 900, 912 (7th Cir. 2011); see also *United States v. Rabiu*, 721 F.3d 467, 470–71 (7th Cir. 2013); *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009); *United States v. Anderson*, 517 F.3d 953, 965 (7th Cir. 2008). It has long been recognized that the Sentencing Guideline provisions for criminal history have a number of rather wooden features that can produce arbitrary results. See U.S.S.G. § 4A1.3 commentary (criminal history score unlikely to take into account all the variations in seriousness of criminal history). That's why even the original version of the Guidelines actually encouraged judges to consider upward and downward departures where strict application of the criminal history provisions substantially over- or under-represented the seriousness of the defendant's history. See U.S.S.G. §§ 4A1.3 & 5H1.8.

The issue about how to characterize Tate's anhydrous ammonia conviction thus provides another good opportunity to remind district judges: A judge facing a close but technical issue under the Guidelines should ask why the answer should

matter for the final sentence, see, e.g., *United States v. Lopez*, 634 F.3d 948, 954 (7th Cir. 2011), and should use the judge's discretion under 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005).

Here, the district judge did not clearly indicate that he would have imposed the same sentence absent the career offender enhancement. Accordingly, we VACATE Tate's sentence and REMAND for resentencing consistent with this opinion.