In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2003

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALTER BLACKMAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-CR-268— **Edmond E. Chang**, *Judge.*

ARGUED APRIL 13, 2016 — DECIDED JULY 29, 2016

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Walter Blackman pleaded guilty to
one count of distributing a controlled substance, in violation of
21 U.S.C. §841(a)(1), and the district court ordered him to serve
a prison term of 180 months. In this appeal, he challenges the
district court's finding that he was responsible for the un-
charged distribution of 3,000 grams of crack cocaine to one of
his customers as relevant conduct and its additional finding

that he possessed a firearm during his narcotics distribution. We find no error in either determination, nor do we agree with Blackman's contention that the district court committed procedural error by failing to address two of his principal arguments in mitigation.

**I.**

Blackman was a ranking official in Chicago's Black Disciples street gang. Blackman and his crew controlled drug trafficking in an area of Chicago's far south side known colloquially as "the hundreds"—a reference to the fact that the cross streets in the neighborhood are numbered 100th through 135th streets. Blackman and his associates distributed large quantities of heroin, powder cocaine, and crack cocaine; Blackman himself was selling wholesale quantities of those drugs to multiple customers. Blackman was among 18 people arrested in April 2013 following a lengthy investigation by the Federal Bureau of Investigation. He was charged in a superseding indictment with 16 counts of distributing various controlled substances (including cocaine, crack cocaine, and heroin) in 2012 and early 2013, in violation of section 841(a)(1). He ultimately pleaded guilty to count two of that indictment, which involved the distribution of 366.2 grams of crack cocaine to a confidential witness (the "CW") on July 24, 2012. In a written plea agreement, the parties agreed, based on the transactions charged in all 16 counts of the indictment, that Blackman was responsible for distributing 1,085.9 grams of crack cocaine, 1,084 grams of powder cocaine, and 389.4 grams of heroin; but Blackman reserved the right to contest, and the government reserved the right to establish, his responsibility for any uncharged drug quantities in excess of these agreed-

upon amounts—in particular, an additional three kilograms of crack cocaine that the government believed Blackman had distributed to Jeffrey Brewer.

The government presented Brewer's testimony at sentencing in support of the additional drug quantity. Brewer was among the 18 people arrested as a result of the government's investigation; he ultimately pleaded guilty to a charge that he possessed, with the intent to distribute, 28 grams or more of crack cocaine, in violation of section 841(a)(1). Brewer had made his living as a street-level dealer in crack cocaine. Blackman was a long-time supplier of Brewer and had "blessed" Brewer into the Black Disciples as a gang member early in 2013. Brewer testified that he had made regular purchases of crack cocaine from Blackman for resale, with cash or by front, beginning late in 2008 and continuing through early 2013. By Brewer's account, the purchases occurred multiple times daily from 2008 through 2010; were interrupted first by a two-to-three month "drought" in 2011 when Blackman had no supply and later by Brewer's incarceration for 100 days; and became intermittent (every two to three weeks) in 2012 to 2013. Brewer also testified both that he had frequently seen Blackman with a gun on his person or in his automobile during this period and that Blackman had supplied three firearms and ammunition to him in 2011 for use in a drug turf dispute with a rival gang. Brewer was cross-examined extensively by Blackman's counsel, who established, among other points, that Brewer had been high on marijuana day and night throughout this period of time, that he was cooperating with the government in the hope of a lesser sentence, and that he had given inconsistent statements both as to when he had

met Blackman and begun acquiring crack cocaine from him and as to the quantities he had obtained from Blackman. In particular, Blackman's counsel emphasized that Brewer, prior to his testimony, had given significantly lower estimates of how much crack cocaine he had typically purchased from Blackman. For example, in connection with his guilty plea, Brewer had estimated that he purchased one-eighth ounce quantities from Blackman on a daily to weekly basis in 2009 and quarter-ounce quantities in 2010; but in his testimony at Blackman's sentencing, he increased these estimates to half-ounce purchases twice daily in 2009 and half-ounce daily purchases in 2010.

Following Brewer's testimony, the parties filed supplemental sentencing memoranda, and the government, at the district court's behest, included with its memorandum a summary of the evidence that corroborated Brewer's testimony. The government cited, among other things, phone records that reflected telephonic contact between Brewer and Blackman during certain portions of the 4.5-year time period during which Brewer testified he had been purchasing crack cocaine from Blackman; recorded phone conversations between the two men in 2012 and 2013 discussing drugs and guns; and photographs of various automobiles, weapons, and ammunition that Brewer had linked to Blackman. The government argued that in light of this and other evidence, Brewer was a credible witness whose testimony as to his course of dealing with Blackman was reliable.

The district court, having considered the parties' submissions, found that Brewer had purchased a minimum of three kilograms of crack cocaine from Blackman from 2009 through

early 2013 and that this quantity should be included in the total drug quantity for which Blackman should be held to account. The court noted at the outset that although Blackman had pleaded guilty to only one count of distribution that involved a single sale of crack cocaine to the CW in July 2012, Blackman had also stipulated to the transactions underlying the other 15 counts of the superseding indictment and conceded that these constituted relevant conduct for sentencing purposes.

> Whether as part of a common plan or the same course of conduct, the offenses were all drug distribution offenses (sometimes crack, sometimes powder cocaine, and sometimes, as Blackman told the CW in July 2012, heroin); the drug deals covered a continuous time period between January 2012 to March 2013, occurred with regularity (that is, they were not all compressed at one end or another of that time period); and several of the deals occurred either at or near the 134th Street house where the July 2012 deal happened.

R. 93 at 2. The court went on to find that the drug dealing between Brewer and Blackman overlapped with and constituted part of the same common plan or course of dealing as the transactions to which Blackman had stipulated and should likewise be treated as relevant conduct. *See* U.S.S.G. § 1B1.3(a)(2). The court found that Brewer was a credible witness: having observed him testify, it was the court's view that Brewer was anything but eager to testify against a Black Disciples gang leader and that he had done his best to remember and recount accurately his dealings with Blackman.

The court acknowledged the prior inconsistent statements Brewer had made as to when he had met Blackman and how much crack cocaine he had obtained from Blackman. Some of these statements could be explained by the motive Brewer had at the time to minimize his dealings with Blackman and the scope of his own criminal conduct. And the court was satisfied that the phone records and other evidence cited by the government corroborated Brewer's account in important respects. The phone records showed that the two men were in contact with one another as far back as 2009 and that they were thereafter in frequent contact during certain time periods. Certain calls between them had been intercepted by government wiretap between October 2012 and January 2013, but in view of Brewer's testimony and the phone records, the court found that the two had a relationship that substantially pre-dated those recorded calls. Brewer's testimony about his course of dealing with Blackman was consistent generally with Blackman's own post-arrest admissions describing the scope of his narcotics operation, and in certain particulars (including his description of Blackman's cars and stash house) had been independently verified. The court found, ultimately, that Brewer had purchased crack cocaine from Blackman beginning no later than 2009 and until early 2013; that, conservatively, Brewer had purchased at least three kilograms of crack cocaine from Blackman during that time period; and that those purchases comprised a common plan or identical course of conduct with the count of Blackman's conviction. On the latter point, the court pointed out that the time period of the Brewer-Blackman transactions overlapped with the transactions to which Blackman had stipulated; that the transactions took

place either in the same area or near by (not far from the stash house where the sale to the CW underlying Blackman's conviction had occurred, for example), and involved the same drug as the count of conviction. R. 93 at 3-4.

The court also found that Blackman had possessed one or more firearms during the period of his drug trafficking. *See* U.S.S.G. § 2D1.1(b)(1). This issue, the court observed, was much simpler to resolve than the appropriate drug quantity. The court noted that there were intercepted calls establishing Blackman's effort to obtain a firearm from James Jones on December 7, 2012, and when Blackman's car was stopped later that day, a .45-caliber pistol had in fact been discovered underneath the front passenger seat, where Jones was sitting. Blackman had also admitted in his post-arrest statement that he was in possession of five other guns as of the date of that seizure but had later disposed of them upon realizing that the government was tracking him. Finally, the court credited Brewer's testimony that he had acquired guns from Blackman in 2011 in connection with a drug turf battle and that Brewer also had seen Blackman in possession of a firearm in 2012. R. 93 at 4.

Each of these findings added two levels to Blackman's base offense level and boosted it from 32 to 36. After a three-level deduction for acceptance of responsibility, his adjusted offense level was 33, which in conjunction with a criminal history category of III yielded an advisory sentencing range of 168 to 210 months. Pursuant to 21 U.S.C. § 841(b)(1)(A)(iii), Blackman was subject to a 10-year minimum term of incarceration. After reviewing the sentencing factors set forth in 18 U.S.C. § 3553(a), the district court sentenced Blackman to a term of 180 months.

## II.

Blackman contends that the district court erred in multiple respects in determining his sentence. He argues that neither his cocaine sales to Brewer nor his possession of one or more firearms should have been factored into the Guidelines calculations, as both (in his view) are too far removed from the conduct underlying his conviction to be considered for sentencing purposes. He also contends that Brewer's testimony as to his transactions with Blackman and Blackman's possession of firearms was too unreliable to support the district court's findings on these points. Blackman further argues that the district court committed procedural error by failing to address two of his principal arguments in mitigation—his challenge to the 18:1 crack-to-powder-cocaine ratio adopted by the Fair Sentencing Act of 2010, 124 Stat. 2372, and now embodied in the Sentencing Guidelines, and his contention that the government engaged in sentencing manipulation. Finally, Blackman briefly contends that his sentence is incompatible with the Fifth and Sixth Amendments to the Constitution to the extent that the enhancements to his sentence were premised on judicial findings based on a mere preponderance of the evidence.

## A.

Highlighting various differences between his dealings with Brewer and his course of dealing with the CW, one sale to whom underlies his count of conviction, Blackman contends that his crack cocaine sales to Brewer do not qualify as relevant conduct for sentencing purposes. He points out that whereas Blackman and Brewer were both Black Disciples, the CW was

a Gangster Disciple and was unknown to Blackman until they were introduced by a third party. The CW also purchased multiple narcotics from Blackman, including heroin, for resale to out-of-town customers, whereas Brewer purchased crack cocaine only and for resale within Chicago. Blackman's sales to the CW were occasional and tended to be in larger quantities than his daily and (eventually) bi-weekly sales to Brewer. The CW paid for his purchases in cash whereas Blackman often fronted crack cocaine to Brewer.

However, the sale to the CW underlying the count of conviction, and Blackman's collective sales to the CW, were part of a much broader course of drug dealing. Pursuant to section 1B1.3(a)(2) of the Guidelines, narcotics-related conduct beyond the scope of a defendant's conviction qualifies as relevant for sentencing purposes if, *inter alia*, it was part of the same course of conduct as the conviction. *E.g.*, *United States v. Baines*, 777 F.3d 959, 963 (7th Cir. 2015); *United States v. Howard*, 80 F.3d 1194, 1203 (7th Cir. 1996). This is so when there is a strong relationship between the uncharged conduct and the offense of conviction, as evidenced by a significant similarity, regularity and temporal proximity between the two. *E.g.*, *Baines*, 777 F.3d at 963; *United States v. Stephenson*, 557 F.3d 449, 456 (7th Cir. 2009). Blackman acknowledged that he and his crew controlled drug distribution in the 100s area of Chicago, and he appropriately stipulated that the other distributions charged in the indictment (to the CW and additional individuals) constituted relevant conduct. So it does not make sense to isolate either the count of conviction or Blackman's distributions to the CW for comparison purposes in assessing what constitutes relevant conduct: the sale underlying the

count of conviction was not the sole drug sale that Blackman made nor was the CW Blackman's only customer. *See United States v. White*, 519 F.3d 342, 348-49 (7th Cir. 2008).

It is clear from the record that throughout 2012 and until his arrest in 2013, Blackman was engaged in a course of significant, continuous drug dealing to multiple customers on the far south side of Chicago, and the sales to Brewer fit comfortably within that course of dealing. Blackman had a much lengthier relationship with Brewer than he did with the CW (by Brewer's account it began in 2008), but it persisted through and overlapped with the time period established by stipulated conduct (January 2012 to March 2013). (Blackman's drug dealing operation did not snap into existence in early 2012.) As with the transactions that Blackman conceded were relevant conduct, the sales to Brewer involved the same distributor of narcotics, obviously (Blackman), one of the three drugs that Blackman and his crew distributed to others (crack cocaine), similar regularity of dealing (on a daily and weekly basis), took place in the same area (in particular "the hundreds" neighborhood) of Chicago, and in some instances, at the same stash house. It was entirely appropriate for the court to treat the transactions with Brewer as relevant conduct. *Cf. Baines*, 777 F.3d 964.

The court's finding that Blackman distributed three kilograms of crack cocaine to Brewer from 2009 to 2013 was not clearly erroneous. There was no dispute that Brewer was one of Blackman's customers. Intercepted conversations between Blackman and Brewer in 2012 and 2013 confirm that they had a drug-trafficking relationship. Brewer gave a detailed accounting of his purchasing relationship with Blackman and

made estimates of the frequency of his purchases and amounts purchased in each year of that relationship. The district court, in turn, appropriately relied on the low end of Brewer's estimates to make a conservative determination of the total quantity of crack cocaine that Blackman distributed to Brewer over time. *See United States v. Tate*, 822 F.3d 370, 373 (7th Cir. 2016) (district court may rely on reasonable estimation to determine relevant drug quantity); *United States v. Claybrooks*, 729 F.3d 699, 707 (7th Cir. 2013) (same).[1] Certainly there were inconsistencies between Brewer's testimony and his various post-arrest statements. In particular, Brewer on the witness stand affixed larger numbers to the quantities he had purchased from Blackman than he had in prior statements. But these points were fully aired both during cross-examination and in the briefing that the district court requested. The district court itself acknowledged and considered the inconsistencies but found, in view of the totality of the record (including evidence that confirmed certain aspects of Brewer's testimony), that Brewer was credible. We have no basis to disturb that finding. *See Tate*, 822 F.3d 373 (noting deference we owe to district court's credibility determinations).

---

[1]   By way of illustration, we note that had the district court relied upon Brewer's testimony regarding the daily amounts he purchased from Blackman in 2009 and 2010, for example, it would have quickly arrived at a total drug quantity of ten kilograms or more of crack cocaine. The court clearly was looking to the lower estimates that Brewer had ventured in earlier statements. The district court also excluded altogether the amounts Brewer testified that he purchased from Blackman in 2008, which represented an earlier beginning to the relationship than Brewer had indicated in any of his prior statements.

**B.**

Nor did the court err in finding that Blackman possessed a firearm during his narcotics trafficking activity. There was ample evidence to support the district court's finding in this regard. For example (and our discussion on this point is by no means exhaustive), Brewer testified that in 2012, Blackman almost invariably had a firearm when Brewer met with him, either on his person or in his vehicle. The district court credited this testimony. The court also found credible Brewer's testimony that Blackman had supplied him with three different guns in 2011 for use in a dispute with a rival gang over drug territory. As we have discussed, Blackman's dealings with Brewer constitute relevant conduct, and as Blackman himself concedes, the possession of a gun during narcotics activity that counts as relevant conduct itself is sufficient to support the enhancement. *E.g.*, *United States v. McCauley*, 659 F.3d 645, 652 (7th Cir. 2011). Blackman nonetheless contends that there is no evidence affirmatively connecting any of the firearms that Brewer mentioned to his narcotics trafficking. But the commentary to the Guideline makes clear that a defendant's possession of a firearm warrants the enhancement "unless it is clearly improbable that the weapon was connected with the offense." § 2D1.1, comment. (n.11(A)). Blackman has cited nothing in the record giving us reason to believe that it was clearly improbable that the firearm or firearms he possessed were connected to his course of drug dealing. *See United States v. Acosta*, 534 F.3d 574, 588 (7th Cir. 2008). Moreover, Brewer testified that when Blackman carried a gun in his vehicle, he typically placed it either in the glove compartment or in an armrest, which happened to be the two places into which he

also placed the narcotics he was delivering to customers like Brewer. That alone suggests a connection between the firearms and his drug dealing. *See, e.g.*, *United States v. Rea*, 621 F.3d 595, 606 (7th Cir. 2010). As does supplying firearms to a customer (Brewer) who was defending his drug turf. *See United States v. Block,* 705 F.3d 755, 763 (7th Cir. 2013).

## C.

Blackman next contends that the district court failed to address two of his principal arguments in mitigation: the contention that the government was guilty of sentencing manipulation by virtue of having its CW purchase, and continue to purchase, crack cocaine from Blackman so as to drive up his Guidelines offense level, and his contention that the district court should reject the 18:1 ratio of powder to crack cocaine reflected in the guidelines and sentence him below the advisory range. A sentencing judge is required to address a defendant's principal arguments in mitigation so long as they have a foundation in the facts of the case and are not too weak to require discussion. *E.g.*, *United States v. Rosales*, 813 F.3d 634, 637-38 (7th Cir. 2016).

The sentencing manipulation argument was not one the district court was required to address. This court has declined to recognize this as a valid sentencing argument. *See United States v. Garcia*, 79 F.3d 74, 76 (7th Cir. 1996); *see also United States v. Vallone*, 698 F.3d 416, 495 (7th Cir. 2012) (collecting cases), *cert. granted & j. vacated on other grounds sub nom. Dunn v. United States*, 133 S. Ct. 2825 (2013), *reinstated as modified*, 752 F.3d 690 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1167, 1466, 1843, 1857 (2015).

Blackman's contention that the court failed to address his challenge to the 18:1 crack-to-powder-cocaine ratio turns out to be mistaken. Although it is true that the court did not mention the argument at sentencing, it did deal with the argument expressly in the written Statement of Reasons attached to the judgment and commitment order.

> It is true that there remains criticism over the crack/powder disparity. Defense counsel argued at sentencing that the then-Attorney General himself had personally advocated for elimination of the disparity. But that carries no extra weight in evaluating the 18 U.S.C. § 3553(a) factors, no more than if a future Attorney General, unable to turn a *personal* opinion into actual official policy or into actual statutory law, opined that he or she personally believed that the current ratio is too *lenient* on crack offenders. The fact is that crack, because it is smoked, does produce a faster high (it is absorbed into the bloodstream faster) than snorted powder cocaine, so there remains, for some drug users, a stronger demand for crack over powder. That is not to say that even the current ratio is always fair, but it is not so strong a mitigation point as to materially influence Blackman's sentence.

R. 100 at 4. Strangely, neither party called to our attention this discussion. We look to a court's written statement of reasons in addition to its oral remarks at sentencing in assessing the sufficiency of its sentencing rationale. *See Baines*, 777 F.3d at

966 (citing *United States v. Pape*, 601 F.3d 743, 747 (7th Cir. 2010), and *United States v. Baker*, 445 F.3d 987, 991-92 (7th Cir. 2006)); *United States v. Ortiz*, 431 F.3d 1035, 1042-43 (7th Cir. 2005). The court's written statement amplifies on its reasons for imposing the sentence it did and makes clear that the court considered Blackman's objection to the crack-to-powder ratio and rejected the argument on its merits. The court was not obligated to say more than it did, particularly given the extent to which the argument, as Blackman's counsel presented it, was more of a blanket policy challenge to the ratio than an exposition on why the ratio worked a particular injustice in this case. *Cf. United States v. Morris*, 775 F.3d 882, 886-88 (7th Cir. 2015) (defendant's argument focused, *inter alia,* on fact that most of crack cocaine attributed to him was counterfeit).

## D.

Finally, Blackman argues that his Fifth and Sixth Amendment were violated because the relevant sentencing findings were not made by a jury based on proof beyond a reasonable doubt but rather by a judge based on a simple preponderance of the evidence. Blackman makes this argument simply to preserve it. He acknowledges that the precedents of both the Supreme Court and this court are squarely against him on this point. *See United States v. O'Brien*, 560 U.S. 218, 224, 130 S. Ct. 2169, 2174 (2010); *United States v. Watts*, 519 U.S. 148, 156-57, 117 S. Ct. 633, 637-38 (1997) (per curiam); *United States v. Bozovich*, 782 F.3d 814, 818 (7th Cir. 2015).

## III.

The district court did a thorough and conscientious job in assessing Blackman's relevant conduct and arriving at an

appropriate sentence. The court did not clearly err in holding Blackman responsible for an additional three kilograms of crack cocaine or for the possession of a firearm during his relevant conduct. Nor did the court commit any procedural error in resolving defendant's arguments in mitigation. The sentence is AFFIRMED.