In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 18-1236 & 18-1315

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAPHAEL CAMPUZANO-BENITEZ and
URIEL SORIA-OCAMPO,

*Defendants-Appellants*.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 15-CR-367-4 & 15-CR-367-3 — **John Robert Blakey**, *Judge*.

_____

ARGUED OCTOBER 25, 2018 — DECIDED DECEMBER 13, 2018

_____

Before ROVNER, HAMILTON, and BARRETT, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Appellants Raphael Campu-
zano-Benitez and Uriel Soria-Ocampo pleaded guilty for their
roles as middlemen in a cocaine deal. The formal charge was
a conspiracy to possess cocaine with intent to distribute in vi-
olation of 21 U.S.C. § 846. Both men appeal their sentences.
They argue that the district court erred on two sentencing
guideline issues: the amount of cocaine the court attributed to

them and their relative roles in the conspiracy. They also argue that the district court erred by allowing a witness to consult with his attorney during his testimony in the appellants' joint evidentiary hearing for their sentencing. We affirm. The district court did not commit clear error in its findings on the amount of cocaine and roles in the offense, and the court did not abuse its discretion in allowing the witness to confer with his attorney.

I.   *Facts and Procedural History*

Raphael Campuzano-Benitez and Uriel Soria-Ocampo initiated and organized the drug deal that led to their arrests and convictions. The two men had known each other before these events, and they played similar roles in the nine-person conspiracy. Soria-Ocampo knew two brothers who were trying to sell multiple kilograms of cocaine. Campuzano-Benitez knew a man named Cesar Perdomo who was looking to arrange a drug transaction for his four potential buyers.

In the days leading up to their arrests, the two appellants and Perdomo worked with their respective contacts to arrange the deal. Three of the four potential buyers, however, were cooperating with law enforcement, and they recorded many of their telephone and in-person conversations with Perdomo.  On June 15, 2015, Perdomo told one of the cooperating buyers that the "little cars that were just painted the other day are ready now."[1] In that conversation, the cooperating buyer told Perdomo that he would take "the five," meaning five kilograms of cocaine. Over the next few days,

---

[1] In the July 18, 2017 evidentiary hearing, Perdomo explained that the conspirators used "cars" as a codeword for kilograms of cocaine because Perdomo worked at an auto body shop.

Perdomo negotiated the final quantity of cocaine and con-firmed the details of the transaction with the cooperating wit-nesses. Perdomo was the only conspirator who communi-cated directly with the potential buyers. Appellants in turn passed along information between Perdomo and the sellers. Perdomo never spoke to Soria-Ocampo or to the sellers di-rectly. He communicated to the sellers' side exclusively through Campuzano-Benitez, who in turn communicated only with Soria-Ocampo.

On the evening of June 17, 2015, though, the conspirators came together. The appellants met Perdomo, one of the sellers, and three of the buyers (two of whom were cooperat-ing) before traveling to the sellers' apartment together to com-plete the transaction. When they arrived, appellants and the others entered the sellers' apartment with one of the cooper-ating witnesses. One kilogram of cocaine had been placed on a bed for the buyers to inspect. Law enforcement arrived be-fore the transaction was complete and arrested everyone pre-sent. The officers saw and seized the single kilogram of co-caine on the bed. They later returned to find five additional kilograms of cocaine and four kilograms of heroin hidden in a closet.[2]

---

[2] The government initially believed all ten kilograms found at the sellers' apartment were cocaine, but testing confirmed that four were ac-tually heroin. The government contends that the two sellers mistakenly believed all ten kilograms were cocaine, and both sellers accepted respon-sibility for ten kilograms of cocaine even after the heroin was discovered. Appellants contend the government's position is "absurd" because the co-caine and heroin were wrapped in different ways and hidden in different sections of the closet. They further contend that the sellers would have received a higher sentence for possessing heroin, so their plea to ten kilo-grams of cocaine should be discredited as too self-serving. Because the

Appellants pleaded guilty to conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. In their plea declarations, Campuzano-Benitez and Soria-Ocampo both accepted responsibility for one kilogram of cocaine. Despite the appellants' similar roles in the conspiracy and similar criminal histories, their presentence investigation reports proposed inconsistent sentencing guideline calculations. In Soria-Ocampo's report, the probation officer attributed only one kilogram of cocaine to Soria-Ocampo and recommended a base offense level of 24. Campuzano-Benitez's probation officer found that he was responsible for ten kilograms of cocaine and recommended a base offense level of 30. Neither officer recommended a downward adjustment under U.S.S.G. § 3B1.2, which allows for a two- to four-level reduction if a defendant played a minor or minimal role in the group's crimes.

By the time the appellants entered their guilty pleas, all but one of their co-conspirators had pleaded guilty and been sentenced. The district judge decided to hold a joint evidentiary hearing for the appellants to address the disputed factual issues about quantity of cocaine and roles in the offense. Perdomo had chosen to cooperate with law enforcement, and he testified at the hearing as part of his plea deal. Perdomo testified about the events leading up to the June 17, 2015 transaction and arrests. He claimed that Campuzano-Benitez was aware of his attempts to negotiate the sale of more than one kilogram of cocaine. During cross-examination, Perdomo

---

base offense level for appellants is the same regardless of whether the transaction was for five or ten kilograms of cocaine, we do not resolve the dispute. See U.S.S.G. § 2D1.1(c)(5).

asserted he "was positive that we were going to sell five kilos of cocaine."

After the government concluded Perdomo's direct examination but before cross-examination began, Campuzano-Benitez's attorney asked for a short break to speak with her client. During this break, Perdomo asked if he could also speak with his attorney. The judge granted Perdomo's request over Soria-Ocampo's objection. The appellants' attorneys then cross-examined Perdomo, questioning his motives for testifying, his inconsistent statements of the events leading to the transaction, and the terms of his plea deal.

The district court later held separate sentencing hearings for each appellant. After referring to the presentence investigation reports, the plea declarations, and testimony from the evidentiary hearing, the court found that the government had proven by a preponderance of the evidence that both men were responsible for five kilograms of cocaine, determined that both had a base offense level of 30, and found that neither was eligible for a mitigating role adjustment under U.S.S.G. § 3B1.2. The court sentenced both men to 69 months in prison followed by three years of supervised release.

Both Soria-Ocampo and Campuzano-Benitez argue that the district court erred by (a) finding them accountable for five kilograms of cocaine instead of one, (b) denying them a mitigating role reduction under U.S.S.G. § 3B1.2, and (c) allowing Perdomo to consult with his attorney between direct and cross-examination during the evidentiary hearing.

II. *Analysis*

A. *Attributable Drug Quantity*

By finding that both appellants were responsible for arranging the sale of five kilograms of cocaine instead of one, the district court increased their sentencing guideline ranges from 37–46 months in prison to 70–87 months (after a downward adjustment of three levels for accepting responsibility). See U.S.S.G. § 2D1.1(c)(8), (5). Appellants argue that the district court erred in attributing five kilograms to them because they both accepted responsibility for only one kilogram in their plea agreements, Soria-Ocampo's presentence investigation report concluded he was unaware of any negotiations for a larger sale, and no reliable evidence supported a larger quantity.

We review the district court's sentencing guideline finding of the attributable drug quantity under § 2D1.1 for clear error. *United States v. Austin*, 806 F.3d 425, 430 (7th Cir. 2015). When reviewing for clear error, "we will reverse only if after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made." *United States v. Ranjel*, 872 F.3d 815, 818 (7th Cir. 2017), quoting *United States v. Marty*, 450 F.3d 689–90 (7th Cir. 2006). The district court did not commit clear error when it determined that Soria-Ocampo and Campuzano-Benitez were both responsible for five kilograms of cocaine.

In calculating the applicable range under the Sentencing Guidelines for a drug crime, "the government must prove by a preponderance of the evidence the quantity of drugs attributable to a defendant." *Austin*, 806 F.3d at 430. A defendant can be held responsible for "all reasonably foreseeable

acts and omissions of others in furtherance of the jointly undertaken criminal activity," including drug quantities. *Id.* at 430–31, quoting *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008). To determine the foreseeable amount of drugs involved in a conspiracy, the district court must conduct a three-part analysis. U.S.S.G. § 1B1.3 cmt. n.3; *Soto-Piedra*, 525 F.3d at 531–32. First, the court must determine the scope of the criminal activity the co-conspirators agreed to undertake. U.S.S.G. § 1B1.3(a)(B)(i). The scope of the criminal activity can include "the scope of the specific conduct and objectives embraced by the defendant's agreement," and when determining the scope, "the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3 cmt. 3(B).

Next, the court must consider whether the conduct of the co-conspirators was both in furtherance of the agreed criminal activity and was reasonably foreseeable to the particular defendant. U.S.S.G. § 1B1.3(a)(B)(ii), (iii); *United States v. Hollins*, 498 F.3d 622, 630 (7th Cir. 2007) (reasonable foreseeability "refers to the scope of the agreement that [a defendant] entered into when he joined the conspiracy, not merely the drugs he may have known about," and government need not prove "that the defendant is involved in or even [had] direct knowledge of a particular transaction"), quoting *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993). When making these determinations, the district court may rely on whatever evidence has "sufficient indicia of reliability to support its probable accuracy." *United States v. Pulley*, 601 F.3d 660, 665 (7th Cir. 2010).

The district court properly identified and applied this analysis to determine the quantity of cocaine attributable to

the appellants. First, in a written opinion explaining its drug-quantity finding, the district court determined the "specific conduct and conspiratorial objectives embraced by both [appellants] consisted of serving as brokers for a single wholesale cocaine transaction between mid-level suppliers . . . and representatives . . . of purported wholesale buyers within the greater Chicago area." *United States v. Soria-Ocampo*, 2018 WL 527926, at *2 (N.D. Ill. Jan. 24, 2018). The court reached this conclusion because it was undisputed that the conspiracy involved a relatively small group over a short period of time. The court found that the transaction was not limited to a single kilogram of cocaine because, when the appellants "agreed to join this endeavor, the parties had not yet decided upon an exact amount of drugs for the deal," and there was "no convincing evidence in the record that somehow the scope of the jointly undertaken criminal activity was ever restricted to no more than one kilogram." *Id.*

Next, the district court did not err in determining that the attempted sale of five kilograms of cocaine was in furtherance of the appellants' joint criminal activity. Appellants did not dispute their roles as brokers of the transaction, so the court reasonably found that this attempted sale "constituted the desired result of the joint criminal activity at issue." *Id.* at *3.

Finally, the district court did not clearly err in concluding the agreement for five kilograms was reasonably foreseeable to the defendants. The court found that a deal for five kilograms of cocaine was "the natural and intended consequence of their actions." *Id.* The evidence before the court included recorded conversations between Perdomo and the buyers negotiating a five- to ten-kilogram deal and testimony from Perdomo that the deal was for five kilograms of cocaine. On this

evidence, the district court would not have been required to find the appellants were responsible for five kilograms, but we are not left with a definite and firm conviction that the court committed a mistake in its analysis. The district court reached a reasonable result on the basis of evidentiary conflicts and uncertainties that are common in drug conspiracy cases.

Appellants argue that the court erred by relying on Perdomo because he was not a credible witness. They highlight inconsistencies in his statements to detectives, his possible motives to lie, and the lack of corroborating evidence. Appellants believe it was clear error to give any weight to Perdomo's testimony regarding the final drug quantity and whether he communicated that amount to the appellants because these statements were "unsubstantiated and self-serving."

We have declined to presume a co-conspirator's testimony is unreliable. We have said many times that "a sentencing judge is free to credit testimony that is totally uncorroborated, comes from an admitted liar, convicted felon, . . . large scale drug-dealing, paid government informant, or self-interested co-conspirator." *United States v. Isom*, 635 F.3d 904, 908 (7th Cir. 2011) (cleaned up); *Austin*, 806 F.3d at 431 ("Determining witness credibility is especially within the province of the district court and can virtually never be clear error.") (also cleaned up). We will not second-guess on appeal the district court's evaluation of Perdomo's testimony.

The district court did not give great weight to Perdomo's testimony anyway. The judge explained that he "didn't find him incredible . . . [or] credible, either. It just didn't really matter as to the uncorroborated portions of his testimony." In

light of Perdomo's possible motive to cooperate and his inconsistent statements, the judge explained that he "of course, considered [the] cooperator testimony with caution and great care." *Soria-Ocampo*, 2018 WL 527926, at *1 n.1. The judge noted that in addition to Perdomo's testimony, "the record here includes numerous recorded undercover conversations, the sworn plea colloquies of several coconspirators, the undisputed portions of the PSRs of Ocampo and Benitez, and the reasonable inferences to be drawn therefrom." *Id.* That was an eminently reasonable approach to Perdomo's testimony.

Appellants also contend that "for there to be reasonable foreseeability on the part of a drug co-conspirator, there must be both, (1) a long tenure of conspiracy and (2) multiple transactions in the course of the conspiracy." They argue that *United States v. Gonzalez*, 765 F.3d 732 (7th Cir. 2014), and *United States v. Seymour*, 519 F.3d 700 (7th Cir. 2008), require a court to consider these additional factors when determining foreseeability of drug quantities. Both *Gonzalez* and *Seymour* used the long-tenure and multiple-transactions factors, however, to "support the finding that the defendant can be held accountable for the aggregate amount of drugs attributable to all the conspirators." *Gonzalez*, 765 F.3d at 739. These cases did not create a new requirement that the court should find defendants liable for the actions of their co-conspirators *only* if the scope of the conspiracy involved multiple transactions over a long period. The district court did not commit clear error by supposedly failing to consider these factors.

In sum, the district court did not err when it attributed five kilograms of cocaine to the appellants and used base offense level 30 for both.

B.  *Mitigating Role Adjustment*

Appellants next argue that the district court erred in denying them a minimal or minor role adjustment because the judge did not consider each of the non-exhaustive factors listed under U.S.S.G. § 3B1.2 cmt. n.3(C). This issue involves a mixed question of law and fact, requiring us to "review a district court's interpretation of the sentencing guidelines de novo and its factual findings for clear error." *United States v. Orlando*, 819 F.3d 1016, 1024 (7th Cir. 2016), citing *United States v. Seals*, 813 F.3d 1038, 1044 (7th Cir. 2016). When reviewing sentencing courts' decisions on mitigating or aggravating roles for clear error, we "will rarely reverse, as the sentencing court is in the best position to determine the role that a defendant had in the criminal activity." *United States v. Sandoval-Velazco*, 736 F.3d 1104, 1107 (7th Cir. 2013).

The Guidelines provide for a downward adjustment of four offense levels for a person who played a minimal role in the joint criminal activity, or two levels if the person was a minor participant. U.S.S.G. § 3B1.2. The appellants remind us that playing a *necessary* role does not *definitively* prevent that same role from also being minor. See *Orlando*, 819 F.3d at 1025. In 2015, the Sentencing Commission added a list of non-exhaustive factors to guide courts in deciding whether a defendant should receive a mitigating role adjustment in an effort to allow more frequent use of mitigating role adjustments. U.S.S.G. § 3B1.2 cmt. n.3(C); see U.S.S.G. App. C. Amend. 794 (list of non-exhaustive factors added because "mitigating role is applied inconsistently and more sparingly than the Commission intended," and noting that adjustment may be appropriate for drug couriers or "mules," or others who have no "proprietary interest in the criminal activity" but are "simply

being paid to perform certain tasks"). The enumerated factors are:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. 3B1.2 cmt. n.3(C). The court should weigh these factors to determine if the defendant seeking the reduction is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, cmt. 3(A).

The district court did not state explicit findings on each of these enumerated factors, but that omission alone was not a reversible error. We do not require district courts to treat sentencing factors as a checklist or to spell out their analyses of each factor at each sentencing. See, e.g., *United States v. Panaigua-Verdugo*, 537 F.3d 722, 728 (7th Cir. 2008) ("The district court need not address each § 3553(a) factor

in checklist fashion, explicitly articulating its conclusion for each factor; rather, the court must simply give an adequate statement of reasons, consistent with § 3553(a), for believing the sentence it selects is appropriate."). Nothing in § 3B1.2 or its application notes suggests the sentencing judge is required to treat these mitigating role factors differently. See also *United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018) ("the district court was not obligated to tick off the [§ 3B1.2] factors on the record to show that it considered them . . . and we have no trouble determining from the sentencing memoranda and the transcript of the sentencing hearing that the district court was well aware of the factors added by Amendment 794").

Like the Ninth Circuit in *Diaz*, we have no trouble determining from this record that the district court was aware of the mitigating role factors. Appellants and the government argued this issue thoroughly before the court several times in their position papers and during their sentencing hearings. With this background, the court explained the facts before it, compared the appellants to other co-conspirators (including one who was granted a mitigating role adjustment), and found appellants were not substantially less culpable than the average participant. While a more explicit discussion of the factors would assist our analysis, the district court did not err by denying appellants mitigating role reductions.[3]

---

[3] Appellants ask us to consider remanding as the Ninth Circuit did in *United States v. Diaz*. 884 F.3d 911. In *Diaz*, the Ninth Circuit remanded the case for resentencing because the district court erred in denying the mitigating role adjustment when the factors clearly weighed in the defendant's favor. *Id.* at 917–18. Our case is unlike *Diaz* in this respect because the mitigating role factors here do not weigh clearly in the appellants' favor. As middlemen in this crime, both appellants understood the scope of the criminal activity was to sell cocaine. Both participated in planning and

C.  *Perdomo's Consultation with his Attorney*

Finally, appellants argue that the district court erred by allowing Perdomo to consult with his attorney at the evidentiary hearing after the government's direct examination but before their attorneys began cross-examination. The parties dispute the standard of review on this issue. Appellants argue that allowing Perdomo to "regroup" with his attorney before cross-examination limited their ability to expose fully Perdomo's bias and thus violated their Sixth Amendment right to confrontation. Appellants contend this violation requires *de novo* review under the logic of *United States v. Hernandez*, 84 F.3d 931 (7th Cir. 1996). The government contends we should review for abuse of discretion because the Confrontation Clause does not apply at sentencing.

We have held that the Confrontation Clause in the Sixth Amendment does not apply at sentencing. *United States v. Ghiassi*, 729 F.3d 690, 695–96 (7th Cir. 2013); *United States v. Isom*, 635 F.3d 904, 907 (7th Cir. 2011). The reliability of information used at sentencing, however, is key. *Isom*, 635 F.3d at 908; see also *United States v. Tucker*, 404 U.S. 443, 447 (1972) (due process requires that information used for sentencing be accurate); *United States v. Guajardo-Martinez*, 635 F.3d 1056, 1059 (7th Cir. 2011); *United States ex rel. Welch v. Lane*, 738 F.2d 863, 864 (7th Cir. 1984). Even if the Confrontation Clause had applied here, it would not have been violated by the judge's

---

organizing the sale, influenced more than a small degree the exercise of decision-making authority, and played key roles in the sale. While the record is not clear regarding their share of the expected profits, it is undisputed that they stood to make some money from a successful transaction. The district court did not err by denying the reduction under the logic of *Diaz*.

handling of the witness at the sentencing hearing. See *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) ("The right to confrontation is not implicated where limitations on cross-examination did not deny the defendants the opportunity to *establish* that the witness may have had a motive to lie; rather, the limitations denied them the opportunity to *add extra detail* to that motive."), quoting *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (emphasis in *Nelson*). We review for abuse of discretion the judge's decision in managing the witness's testimony.

The trial court has broad discretion to control the court during the cross-examination of a witness so that the court can implement the most effective procedures for determining the truth, avoid wasting time, and protect a witness if necessary. See Fed. R. Evid. 611(a). This discretion certainly includes deciding whether to allow a non-party witness to speak with his attorney between direct and cross-examination. See *Perry v. Leeke*, 488 U.S. 272, 282 (1989) ("it is entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, whether the defendant or a nondefendant, that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer"); *Geders v. United States*, 425 U.S. 80, 87–88 (1976) (trial judge has "sound judicial discretion" to sequester non-party witnesses before each recess, forbidding them from even speaking with their attorneys, but the accused has broader Sixth Amendment rights to confer with his attorney).

It was squarely within the district court's discretion to allow Perdomo to confer briefly with his attorney after direct

examination. We find no evidence in the record that the court
abused that discretion.[4]

---

[4] Appellants argue that the Supreme Court decision in *Perry v. Leeke*
demands that we find the court abused its discretion. In *Perry*, the district
court refused to allow a defendant-witness to consult with his attorney in
circumstances much like these. The Supreme Court reasoned that prohib-
iting a witness from consulting with his attorney in a fifteen-minute break
between direct and cross-examination was appropriate because

> the truth-seeking function of the trial can be impeded in
> ways other than unethical "coaching." Cross-examination
> often depends for its effectiveness on the ability of coun-
> sel to punch holes in a witness' testimony at just the right
> time, in just the right way. Permitting a witness, including
> a criminal defendant, to consult with counsel after direct
> examination but before cross-examination grants the wit-
> ness an opportunity to regroup and regain a poise and
> sense of strategy that the unaided witness would not pos-
> sess. This is true even if we assume no deceit on the part
> of the witness; it is simply an empirical predicate of our
> system of adversary rather than inquisitorial justice that
> cross-examination of a witness who is uncounseled be-
> tween direct examination and cross-examination is more
> likely to lead to the discovery of truth than is cross-exam-
> ination of a witness who is given time to pause and con-
> sult with his attorney.

488 U.S. at 282. While this reasoning supported appellants' request to for-
bid Perdomo from consulting his lawyer, *Perry* was explaining the reasons
to allow a district court the discretion to forbid such consultation. The
Court did not create a blanket rule prohibiting courts from allowing such
consultation, nor would such a rule be practical, particularly in light of the
issues a witness may face concerning privilege, duties of confidentiality to
third parties, and so on.

The district court did not err in sentencing or abuse its discretion during the evidentiary hearing. The judgments of the district court are AFFIRMED.