In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1485

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL JARIGESE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cr-00656-2 — **Robert W. Gettleman**, *Judge.*

ARGUED JANUARY 19, 2021 — DECIDED JUNE 2, 2021

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted Michael Jarigese of
nine counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and
1346, and one count of bribery, in violation of 18 U.S.C.
§ 666(a)(2). The district court sentenced him to forty-one
months' imprisonment and three years of supervised release.
He challenges both his conviction and his sentence. We affirm.

**I.**

Michael Jarigese was the vice president of Castle Construction Corporation ("Castle"), and the president of its successor company, Tower Contracting LLC ("Tower"), when he signed three contracts with the City of Markham for public construction projects. Castle and Tower were owned and operated by members of the Blum family. Each of the Markham contracts were designated by the City's mayor, David Webb, as "design-build" projects, which meant that they were not subject to a public bidding process. Instead, Mayor Webb had the authority to invite one or more contractors to submit a proposal, which was then presented to the City Council for approval before the Mayor signed the contract.

For the first project, Webb invited only Castle to submit a proposal to build a new city hall. In 2008, Markham awarded the city hall contract to Castle. Webb signed the $8.3 million contract on behalf of the City, and Jarigese, in his capacity as vice president, signed for Castle. In 2010, Webb invited only Tower to submit a proposal to build a senior living facility, and through the same process, Markham awarded a $10.5 million contract to Tower, with Webb again signing for Markham, and Jarigese signing this time as president of Tower. Tower's profit margin on the senior living facility contract was approximately $2.6 million, or twenty-four percent of the contract price. In 2012, again using the same process, Markham awarded another contract to Tower for the renovation and expansion of a park district building. Mayor Webb signed the $3.4 million contract on behalf of the City and Jarigese signed as president of Tower. Tower's profit on the park district project was

approximately $1.2 million, or more than a third of the contract price.

In January 2012, when the senior living facility was near completion but before Markham awarded the park district building project to Tower, Mayor Webb met in person with Jarigese. Webb asked Jarigese to submit a proposal for the park district project so that Webb could use the contract price to determine the amount of money Markham would need to raise through bonds to finance the project. Webb pointed out to Jarigese that Tower (and Castle) had already been involved in two big projects (meaning the city hall and the senior living facility), and that a third project was coming up. Webb then solicited a bribe, asking Jarigese for $100,000. Jarigese replied that he would look into it and get back to him. Webb understood this to mean that Jarigese needed to consult with the Blum family before agreeing to the request. Robert Blum was Castle's president and chief executive officer. Robert's son, Anthony, was Tower's chief executive officer, and his other son, Philip, was Tower's vice president. Robert's wife, Nancy, was the controller of Tower, and the mother of Anthony and Philip.

A few days after Webb's request, Jarigese met with him again and asked who to make the check out to. Webb told him to write the check to KAT Remodeling, and provided a post office box as the address of the payee. Webb later testified that he had formed KAT Remodeling years earlier with the intention of starting a business with his children, whose names he used to form the acronym "KAT." The business, incorporated by one of his children, never got off the ground, however, and Webb instead used the company's bank account as a repository

for the bribes he solicited. KAT Remodeling never performed any work of any kind, and the vast majority of the money in KAT Remodeling's bank account, which had been opened by one of Webb's children, came from Jarigese and another contractor who paid bribes to Webb.

In mid-February 2012, Jarigese hand-delivered to Webb a check made out to KAT Remodeling in the amount of $75,000. The check, which was signed by Anthony Blum, contained the address that Webb had given Jarigese for the business. At this same meeting, Jarigese showed Webb an invoice from KAT Remodeling, telling Webb it described the work that KAT completed for Tower. Webb understood Jarigese to mean that Jarigese had created the invoice to disguise the nature of the $75,000 payment. Webb assumed that the $75,000 check was a partial payment on the $100,000 that he had requested and considered it to be "a great start." Over the following months, Jarigese delivered cash to Webb on four or five occasions, concealing as much as $2500 in a coffee cup at each delivery. Jarigese obtained the cash from Nancy Blum, telling her multiple times that he was going to meet with Webb, and asking her to make out checks to cash. Anthony Blum approved the checks, which Nancy then cashed for Jarigese. Finally, in May 2013, after Tower completed the park building project, Jarigese delivered a $10,000 check to Webb, again payable to KAT Remodeling. Jarigese asked Tower employees to prepare the check and falsely accounted for it in Tower's business records as a donation to a Markham festival. Anthony Blum approved the check.

Jarigese was not the only person paying bribes to Webb related to contracts with the City of Markham. Evidence at trial

showed that Webb also solicited a bribe from Thomas Summers, the owner of Alsterda Cartage & Construction, after awarding Alsterda a contract in 2008 for sewer and water main projects. Webb told Summers that Summers had a "big job here," and that Webb "needed some money." Summers subsequently paid Webb approximately $170,000 in checks and cash. The first payment was a personal check for $30,000 from Summers payable to KAT Remodeling. But KAT Remodeling never performed any work for Summers. After receiving the check, Webb used his mayoral authority to award additional public work to Alsterda. From 2009 through 2011, Summers gave Webb four additional checks totaling $106,245, payable to KAT Remodeling, "Kats [sic] Investments" and "Kats [sic]." None of these entities performed any work in exchange for these sums. Summers disguised another bribe payment by writing a check for $28,770 to Webb's son. On the memo line of the check, Summers indicated that the payment was for a Ford truck, but Summers never received a truck, and this was simply another way to hide the true nature of the transaction. Summers also supplied Webb with smaller cash payments of $2,000 or less in this same time frame.

Finally, Joseph Letke also paid bribes to Webb in exchange for work with Markham. Letke owned a company named Public Funding Enterprise, and also worked as a consultant and comptroller for Markham. Letke supplied cash to Webb and also a $15,000 check from Public Funding Enterprise to "Katz [sic] Investments." With Letke's assistance, Webb had formed a company called KAT Realty Investments and had his son and daughter open a bank account for the company. Like KAT Remodeling, the company never did any work, and Webb

used the bank account to receive bribes from Letke and Summers.

As a result of this conduct, Webb was charged with wire fraud and filing a false tax return. Webb agreed to cooperate with the government and pleaded guilty to both counts. Jarigese and Tower were charged in a superseding indictment ("Indictment") with nine counts of wire fraud and one count of bribery. The Indictment charged that Tower and Jarigese participated with Webb, Summers and others in a scheme to defraud Markham of money, property, and the intangible right of Webb's honest services. In describing the scheme, the Indictment alleged that Webb solicited bribes in exchange for using his authority as mayor to award the park building project to Tower. The Indictment specified that Jarigese caused Tower to issue bribery payments to Webb disguised as payments to KAT Remodeling. Each of the nine wire fraud counts against Tower and Jarigese alleged that the defendants, for the purpose of executing that bribery scheme, caused payments to be sent from the accounts of the City of Markham to Tower's account at First Midwest Bank, in partial payment for the work Tower performed on the park building project. The tenth count, for bribery, alleged that Tower and Jarigese gave cash to Webb and a $10,000 check payable to KAT Remodeling with the intent to influence and reward Webb for using his authority in connection with the park building project.

Webb testified against Jarigese and Tower. The government also presented corroborating documentary evidence and additional witnesses. The jury found Jarigese guilty on all of

the charged counts.[1] The district court sentenced Jarigese to a term of forty-one months' imprisonment, at the low end of the guidelines range. Jarigese appeals.

## II.

Jarigese challenges both his sentence and his conviction on appeal. On the sentence, he argues that: (1) the district court failed to comply with Federal Rule of Criminal Procedure 32(i)(A)(1) when it did not verify that Jarigese had read the presentence report ("PSR") and discussed it with his attorney; (2) the court erred when it did not adopt the PSR at the sentencing hearing but later indicated that it had adopted the PSR in the written Statement of Reasons attached to the judgment; (3) the court relied on a clearly erroneous fact at sentencing; (4) the cumulative effect of these first three errors requires remand for re-sentencing; and (5) the sentence was substantively unreasonable. In challenging his conviction, Jarigese contends that the evidence was insufficient to convict him, and that the court erred in admitting certain evidence that he characterizes as irrelevant and highly prejudicial.

## A.

We begin with Jarigese's objections to the admission of certain evidence. We review the court's decision to admit or exclude evidence for abuse of discretion. *United States v. Chhibber*, 741 F.3d 852, 855 (7th Cir. 2014); *United States v. Simon*, 727 F.3d 682, 696 (7th Cir. 2013). We will reverse and order a new trial only if any evidentiary errors are not harm-

---

[1] Tower was also convicted on all counts. This appeal concerns only the conviction and sentence of Jarigese.

less. *Simon*, 727 F.3d at 696. Jarigese contends that the district court wrongly admitted evidence of Webb's solicitation of bribes from Summers and Letke, neither of whom was on trial. Jarigese argues that evidence of Webb's prior bad acts should not have been admitted unless it met the standards set forth in Federal Rules of Evidence 404(b) and 403. In general, evidence of other bad acts is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But it may be "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Rule 403 allows a court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, among other reasons. According to Jarigese, Mayor Webb's scheme of extorting money from contractors engaged in business with the City of Markham was irrelevant to the issue of whether Jarigese bribed Webb. Jarigese also argues that this evidence was not probative of his motive, opportunity, intent, or any other purpose listed in the rule. Instead, he contends, to the extent that it was relevant, it was unfairly prejudicial because it suggested that under Webb's administration, contractors were routinely expected to bribe the Mayor in order to obtain contracts with the City.

The district court correctly concluded that evidence of Webb's solicitation of other bribes was not evidence of "other bad acts" but rather was directly relevant to proving the charged scheme. That is, the Indictment charged that Webb, Jarigese, Summers and others were engaged in a scheme to

defraud the City of Markham of money through Webb soliciting and the others paying bribes in exchange for contracts with the City. As alleged in the Indictment, the defendants took steps to conceal the scheme by directing that checks be made payable to KAT Remodeling, KAT Realty Investments, and to Webb's son supposedly in exchange for work done or goods provided, when in fact no work was done and no goods were provided. The evidence to which Jarigese objected thus provided proof of a fact alleged in the Indictment, that the schemers attempted to conceal their unlawful actions using KAT Remodeling and other entities and persons to transmit the bribes to Webb. "[E]vidence of one participant's actions in furtherance of a scheme to defraud is admissible against the other participants in that scheme, just as it is in a conspiracy case." *United States v. Warner*, 498 F.3d 666, 701 (7th Cir. 2007) (quoting *United States v. Adeniji*, 221 F.3d 1020, 1027 (7th Cir. 2000)). The district court did not abuse its discretion by admitting direct evidence of the scheme charged; neither Rule 403 nor Rule 404(b) required exclusion of this evidence.

Jarigese's challenge to the sufficiency of the evidence is similarly without merit. When a defendant challenges the sufficiency of the government's evidence in a Rule 29 motion for a judgment of acquittal, as Jarigese did below, we review *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019); *United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015). We must affirm if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Cruse*, 805 F.3d at 811. Jarigese primarily complains that the government's case was based largely on the "self-serving"

testimony of Mayor Webb. He argues that Webb was motivated to cast blame on Jarigese in order to reduce the sentence for his own admitted criminal conduct.

Jarigese rightly concedes that the self-serving nature of Webb's testimony generally is not a sufficient reason for rejecting testimony as not credible. *Payne v. Pauley*, 337 F.3d 767, 771–73 (7th Cir. 2003). He contends that rejecting testimony as not credible requires specific evidence such as contradictory accounts or other impeachment evidence, citing a few summary judgment cases. He argues that he meets that standard here because Webb was impeached at trial regarding previous lies he told under oath, and with evidence of other crimes involving dishonesty. But Jarigese confuses what is necessary to defeat summary judgment with what is necessary to overcome a jury's finding on credibility. The jury was certainly free to reject Webb's testimony, but it was also free to credit it, and apparently it chose the latter. We do not second guess jury determinations on credibility unless the testimony is so implausible that it cannot be trusted as a matter of law. *United States v. Calabrese*, 572 F.3d 362, 369 (7th Cir. 2009). To meet that standard, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all. *Cherry*, 920 F.3d at 1139. Nothing in Webb's testimony comes close to meeting this standard. Although Jarigese also complains that another witness suffered similar credibility problems and that the government's documentary evidence was thin, the jury was free to credit this evidence, and Jarigese offers no reason sufficient to overturn the jury's conclusions. In short, the

evidence was sufficient to support the convictions on all counts.

**B.**

We turn to Jarigese's claims that the district court's errors at sentencing require a remand for re-sentencing. Our review of sentencing decisions generally is limited to whether they are reasonable, applying the abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 46 (2007). We first must ensure that the district court committed no significant procedural errors, such as incorrectly calculating the guidelines range, failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to explain adequately the chosen sentence. *Gall*, 552 U.S. at 51. After *United States v. Booker*, 543 U.S. 220 (2005), whether the district court followed the proper procedures in imposing sentence is a question of law that we review *de novo*. We review the district court's findings of fact for clear error. *United States v. Knox*, 624 F.3d 865, 870 (7th Cir. 2010). Sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness. *Rita v. United States*, 551 U.S. 338, 341–49 (2007); *United States v. Anobah*, 734 F.3d 733, 736 (7th Cir. 2013); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). If the district court erred in sentencing Jarigese, we will apply the doctrine of harmless error in determining whether re-sentencing is necessary. *United States v. Olson*, 450 F.3d 655, 683 (7th Cir. 2006). An error related to the validity of a defendant's sentence is harmless only if it did not affect the district court's choice of sentence. *Olson*, 450 F.3d at 683.

Jarigese first argues that the district court failed to comply with Federal Rule of Criminal Procedure 32(i)(A)(1) at his sentencing hearing. Rule 32(i)(A)(1) requires a court to directly question the defendant about the PSR:

> The district court at the sentencing hearing need directly ask the defendant only three questions—whether he or she has had an opportunity to read the report, whether the defendant and defense counsel have discussed the report and whether the defendant wishes to challenge any facts in the report.

*United States v. Rone*, 743 F.2d 1169, 1174 (7th Cir. 1984). The government concedes that the district court neglected this important task but contends that the error was harmless. We have advised district courts "to carry out this brief questioning in the interest of 'focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence.'" *United States v. Rodriguez-Luna*, 937 F.2d 1208, 1213 (7th Cir. 1991) (quoting *Burns v. United States*, 501 U.S. 129, 134 (1991)). Nevertheless, we need not remand for resentencing if the "defendant's right to a fair sentencing process was not compromised," *i.e.*, if the error was harmless. *Rodriguez-Luna*, 937 F.2d at 1208; *Olson*, 450 F.3d at 683.

Jarigese asserts that the error was not harmless because he did not have an opportunity to contest a factual error in the PSR on which the district court relied in sentencing him. In particular, the PSR stated that he was the president of Castle when in fact he was only the vice president. Although Jarigese is correct that the PSR erroneously stated that he was president

of both Castle and Tower, this error was harmless for two reasons. First, both the government and defense counsel correctly identified Jarigese as vice president of Castle and president of Tower during the sentencing hearing. R. 237, at 9, 16–17, 27. Second, the district court did not rely on Jarigese's title at either company in determining his sentence, but rather focused on his role in signing contracts on behalf of the companies with the City of Markham, the level of responsibility he held at both companies, and the level of trust that the owners of the companies placed in him.

Jarigese had signed the $8.3 million contract for the city hall project when he was vice president of Castle, indicating that he was in a position of great trust and responsibility at Castle. The government argued, and the court agreed, that Jarigese was aware that Castle and Robert Blum had been convicted of fraud but he continued to work for Castle and then Tower, and still made the decision to pay a bribe to Webb. In particular, Robert Blum had been convicted of tax fraud in federal court in 2010, related to funds he had taken from Castle for his own use. And Robert Blum and Castle had also pled guilty in 2011 to state charges for fraudulently obtaining $18 million in public money intended for minority-owned businesses. As a result, Castle was suspended from entering into federal contracts and barred from performing state or city public work for five years. The government argued in the district court that Jarigese had a "front-row seat for all of those sanctions," but rather than being moved to respect the law, he decided to pay the bribe for Tower. Jarigese has not contested the accuracy of any of that information, and has focused only on the PSR's error in his title at Castle. Because it is pellucid from the record that the court

did not base the sentence on Jarigese's title but rather on an accurate portrayal of his role, level of responsibility and position of trust at Castle and Tower during this period of unlawful activity, the error was harmless.

None of Jarigese's other complaints about his sentence fare any better. He asserts that the court erred by not adopting the PSR at the sentencing hearing but later indicating that it had adopted the PSR in the written Statement of Reasons attached to the judgment. There is no requirement that a court adopt the PSR, only that the court explain in open court the reasons for imposing the particular sentence. 18 U.S.C. § 3553(c). It is true that the oral pronouncement of the sentence takes precedence over the written judgment. *United States v. Thompson*, 777 U.S. 368, 376 (7th Cir. 2015). That means that if the court had not adequately explained its reasons for the sentence at the oral pronouncement, adopting the PSR in the written judgment would not have cured the error. But the court more than adequately explained in the oral pronouncement the reasons for the sentence. The only prejudice asserted by Jarigese is that he does not know whether the court considered him president or vice president of Castle, a fact that we have just concluded was not of any consequence in determining the sentence. Any error in adopting the PSR in the written judgment after not expressly adopting it at the hearing was therefore harmless.

Jarigese also complains that the court relied on a clearly erroneous fact at sentencing, incorrectly stating that he had called Nancy Blum as a witness at trial, and then holding against him that he had called a witness who had perjured herself. He is correct that the court stated that Nancy Blum lied during her testimony and that, "you sat there, of course, and

let it happen. You called her." R. 237, at 45. But immediately after the court pronounced the sentence, the government corrected the court and pointed out that Nancy Blum had been called by Tower, not Jarigese. The court then noted that she was a "defense witness," which was correct, and said:

> I appreciate the correction. But the point I was making is that I didn't believe her either, and obviously, the jury didn't believe her. I think that's pretty plain.

R. 237, at 51. In other words, the court did not rely on this misapprehension in setting the sentence and the misstatement was therefore harmless. In any case, Jarigese did rely on Nancy Blum's testimony in his closing argument when he contended that the payments to KAT were for legitimate work completed by KAT, a claim supported solely by Nancy Blum's testimony.

So the first three asserted sentencing errors are without merit and nothing about the cumulative effect requires remand for re-sentencing. The only remaining issue is Jarigese's claim that his sentence was substantively unreasonable. The court sentenced Jarigese to the bottom of the properly calculated guidelines range, forty-one months. Sentences that are within the properly calculated guidelines range are entitled to a rebuttable presumption of reasonableness on appeal. *Rita*, 551 U.S. at 341–49; *Mykytiuk*, 415 F.3d at 608. The defendant bears the burden of rebutting that presumption by demonstrating that the sentence is unreasonably high in light of the section 3553(a) factors. *Mykytiuk*, 415 F.3d at 608. Jarigese asserts that his sentence is substantively unreasonable under section 3553(a)(6), which requires courts to consider "the need to avoid

unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar con-
duct[.]" He cites a number of cases involving persons con-
victed of public corruption who received sentences lower than
forty-one months' imprisonment. Jarigese forfeited this
argument by failing to raise it below, and so we review it for
plain error only. *United States v. Olano*, 507 U.S. 725, 731 (1993);
Fed. R. Crim. P. 52(b). Jarigese fails to identify any error, much
less plain error:

> Sentencing disparities are at their ebb when the
> Guidelines are followed, for the ranges are them-
> selves designed to treat similar offenders similarly.
> That was the main goal of the Sentencing Reform
> Act. The more out-of-range sentences that judges
> impose after *Booker*, the more disparity there will be.
> A sentence within a properly ascertained range
> therefore cannot be treated as unreasonable by
> reference to § 3553(a)(6).

*United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). *See
also United States v. Serfling*, 504 F.3d 672, 681 (7th Cir. 2007)
(under *Boscarino*, a sentence within a properly calculated
guidelines range cannot be treated as unreasonable by refer-
ence to section 3553(a)(6); valid reasons exist for sentencing
similar defendants differently, and only unwarranted dispari-
ties are problematic). Jarigese has failed to identify any
*unwarranted* disparity between his sentence and the sentences
that other defendants received. Indeed, his descriptions of the

other cases demonstrate a wide range of circumstances that provide ample reasons for the variations in the sentences. Nothing on this record requires a remand for re-sentencing.

AFFIRMED.