In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 22-2349

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

XUAN TAM,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cr-00158-5 — **Virginia M. Kendall**, *Judge.*

---

ARGUED MARCH 29, 2023 — DECIDED SEPTEMBER 7, 2023

---

Before SYKES, *Chief Judge*, and ROVNER and BRENNAN,
*Circuit Judges.*

ROVNER, *Circuit Judge*. Xuan Tam was charged in a super-
seding indictment with conspiracy to commit money launder-
ing in violation of 18 U.S.C. § 1956(h), money laundering in
violation of 18 U.S.C. § 1956(a)(1)(B)(i), and operating an un-
licensed money transmitting business in violation of 18 U.S.C.
§ 1960(a). Pursuant to a written plea agreement, he pled guilty
to conspiracy to commit money laundering, and the court

sentenced him to a below-Guidelines sentence of 65 months' imprisonment. He now raises a number of challenges to the sentence.

The written plea agreement set forth the factual basis for the plea, and we limit our facts to those included in that plea agreement. From February 2017 until September 2017, Tam worked with Minghan Chen, Zhiqiang Chen, Weishe Tan, Chris Mei, and others, in a scheme to launder the funds from unlawful narcotics transactions by Mexican drug traffickers through bank accounts in China. For instance, between May and July of 2017, Tam conducted 10-20 pickups of money at the direction of Weishe Tan, in amounts ranging from $30,000 to $150,000 per pickup. When a client was in possession of drug proceeds which needed to be collected and exchanged for Chinese Renminbi ("RMB"), Weishe Tan or Zhiqiang Chen would contact Tam. He then provided Weishe Tan or Zhiqiang Chen with the serial number on a dollar bill in his possession, a cellphone number, and a code name that he would use for the transaction.

Shortly after Tam provided that information to them, he would be contacted by an individual who had drug proceeds to deliver to Chicago. The client provided Tam with the serial number that Tam had given to Weishe Tan or Zhiqiang Chen, and once Tam confirmed the match, Tam would make arrangements to meet the caller in Chicago. At that meeting. Tam took possession of the U.S. dollars obtained through unlawful drug transactions. The person who delivered the quantities of U.S. dollars then received from Tam the dollar bill containing the serial number that had been used as an identifier in the transaction. That dollar bill with the serial number functioned as a receipt for the bulk currency exchange.

Once he received the currency, Tam or others including Weishe Tan, counted the money and reported the total amount to Zhiqiang Chen, who then provided information for Chinese bank accounts to be used in the transaction. Tam or Weishe Tan then delivered the dollars to a broker, or to an intermediary who delivered it to a broker, and the broker arranged payment for the dollars by releasing an equivalent amount of RMB in China to the bank accounts that Zhiqiang Chen had provided.

Between approximately May 2017 and August 2017, Tam participated in the transfer of around $1.4 million in narcotics proceeds through the collection of those narcotics proceeds from various individuals and through the exchange of dollars for RMB. He was paid a small percentage fee for each laundering transaction, earning approximately $7,500 for those services. Tam acknowledged that he was aware that the proceeds he was collecting and delivering were derived from the sale of narcotics, and knew that the manner of collecting and exchanging the proceeds was designed to hide the proceeds, as well as the source and nature, from law enforcement, and ultimately to remit the funds back to drug traffickers in Mexico.

The written plea agreement also included a recognition of the potential sentence. It included an acknowledgment that Tam was subject to a maximum sentence of 20 years' imprisonment. Moreover, it set forth the Sentencing Guidelines range for the offense to which he was pleading guilty. The plea agreement set forth a base offense level of 22 pursuant to Guidelines §§ 2S1.1(a)(2) and 2B1.1(b)(1)(H), because the value of the laundered funds was approximately $1.4 million. It then reflected a potential decrease of 3 levels for acceptance

of responsibility under § 3E1.1(a) and § 3E1.1(b), and increases in the offense levels as follows: 6 level increase pursuant to § 2S1.1(b)(1), because § 2S1.1(a)(2) applies and Tam knew that the laundered funds were proceeds of an offense involving a controlled substance; 2 level increase under § 2S1.1(b)(2)(B), because the defendant was convicted under 18 U.S.C. § 1956; 2 level increase under § 2S1.1(b)(3), because § 2S1.1(b)(2)(B) applies and the offense involved sophisticated laundering. The plea agreement reflected disagreement as to whether Tam was a minor participant in the offense, and therefore entitled to a decrease of 2 levels pursuant to § 3B1.2(b). The agreement projected a Guidelines range of 87-108 months' imprisonment if the minor participant decrease was not applied, and 70-87 months' imprisonment if the court determined that the minor participant reduction was proper. Following the plea, the court imposed a sentence of 65 months' imprisonment, which was below both of those Guidelines ranges.

Tam pursues two challenges on appeal. First, he alleges that the district court failed to ask the questions required in Federal Rule of Criminal Procedure 32(i)(1)(A) and that the error was not harmless. Second, he asserts that the court erred in denying a downward adjustment on his offense level due to his minor role in the offense, pursuant to U.S.S.G. § 3B1.2. Although Tam initially raised an ineffective assistance of counsel claim in his brief in this appeal, he withdrew that claim—as we have repeatedly advised defendants to do—in order to preserve the ability for Tam to pursue it in a subsequent proceeding in which the factual basis of the claim can be developed. See *United States v. McClinton*, 23 F.4th 732, 736–37 (7th Cir. 2022).

We turn, then, to his claim that the district court failed to comply with Rule 32(i)(1)(A). That rule, in conjunction with Rule 32(i)(1)(C), required the court to directly ask Tam three questions—whether he had an opportunity to read the Presentence Investigation Report ("PSR"), whether he and defense counsel had discussed the PSR, and whether he wished to challenge any facts in the PSR. *United States v. Hise*, 65 F.4th 905, 908 (7th Cir. 2023); *United States v. Jarigese*, 999 F.3d 464, 472 (7th Cir. 2021); *United States v. Rone*, 743 F.2d 1169, 1174 (7th Cir. 1984). Although "[w]e have advised district courts to carry out this brief questioning in the interest of focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence …, we need not remand for re-sentencing if the defendant's right to a fair sentencing process was not compromised, i.e., if the error was harmless." (internal quotation marks and citations omitted) *Jarigese*, 999 F.3d at 472; *Hise*, 65 F.4th at 908.

In *Jarigese*, the defendant argued that the failure of the court to ask the Rule 32(i)(A)(1) questions was not harmless because, as a result of that error, he did not have the opportunity to contest a factual error in the PSR which was relied upon by the court in sentencing him. *Jarigese*, 999 F.3d at 472. We rejected that argument, because the factual error identified by Jarigese, his title—president or vice president—at two companies, was correctly stated during the sentencing hearing, and because the court did not rely on his title in determining Jarigese's sentence, focusing instead on facts regarding his responsibilities at the companies and his role in signing contracts. *Id*. Because the factual error in the PSR which Jarigese could have raised was not relevant to the sentence imposed, we held that the error in failing to ensure that he had reviewed the PSR was harmless. *Id*. at 472–73

Here, the government concedes that the district court failed to ask those questions but argues that the error was harmless. In contrast to the defendant in *Jarigese*, Tam does not assert that he in fact was denied the opportunity to read the PSR or to consult with his attorney and register objections, nor does he identify any specific objections that he would have made given that opportunity.[1] Moreover, at the sentencing hearing, Tam's attorney affirmatively confirmed that Tam had seen the PSR and that they had discussed it, stating: "I have reviewed both reports with my client, and there are no factual changes." Sent. Tr. at 4. Given that representation, and the failure of Tam to argue even now that he did not see the report or that he would have raised specific challenges if given that opportunity, the error was harmless.

Tam next challenges the district court's refusal to grant a downward adjustment on his offense level due to his minor role in the offense, pursuant to U.S.S.G. § 3B1.2. Such an adjustment is proper where the defendant is "substantially less culpable than the average participant" in the conspiracy.

---

[1] In a supplemental filing after oral argument, Tam asserts that, through appellate counsel, he in fact represented that if the district court inquired as to whether he had read the report, he would have responded that he had not. No cite to the brief substantiates that assertion, and in his brief, he argues only that the error was not harmless because the sentencing court never learned *whether* Tam was given the opportunity to read and review the PSR. He also asserts, without citing any specific example, that the appellate brief provides numerous examples of what additions, modifications and corrections would have been made if counsel had discussed the contents of the PSR with Tam, but his brief states only that his counsel could have made further inquiries, such as to the nature of Tam's role. The brief fails to identify a single fact or legal argument that he would have presented but was deprived of the opportunity to pursue.

U.S.S.G. § 3B1.2 cmt. n.3(A); *United States v. Freyermuth*, ___ F.4th ___, 2023 WL 5006842, \*2 (7th Cir. 2023); *United States v. Orlando*, 819 F.3d 1016, 1025 (7th Cir. 2016). In assessing the applicability of that adjustment, then, "[w]e compare the defendant's role to that of an average member of the conspiracy, not with that of the leaders." *Orlando*, 819 F.3d at 1025.

Tam asserts that the district court denied the adjustment without considering the five factors identified by the Sentencing Commission as a non-exhaustive guide for courts in determining whether a defendant should receive a mitigating role adjustment:

> (1) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (2) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and
>
> (5) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2 cmt. n.3(C). That issue encompasses a mixed question of law and fact, requiring us to review *de novo* the district court's interpretation of the Sentencing Guidelines and for clear error its factual findings. *United States v. Campuzano-Benitez*, 910 F.3d 982, 989 (7th Cir. 2018). We have repeatedly recognized that, "when reviewing sentencing courts' decisions on mitigating or aggravating roles for clear error, we 'will rarely reverse, as the sentencing court is in the best position to determine the role that a defendant had in the criminal activity.'" *Id.*, quoting *United States v. Sandoval-Velazco*, 736 F.3d 1104, 1107 (7th Cir. 2013).

Tam asserts that the district court failed to properly address and consider those factors. As an initial matter, we note that a court's failure to state explicit findings on each of the enumerated factors does not alone constitute reversible error. *Campuzano-Benitez*, 910 F.3d at 989. As we explained in *Campuzano-Benitez*, "[w]e do not require district courts to treat sentencing factors as a checklist or to spell out their analyses of each factor at each sentencing," … [and] [n]othing in § 3B1.2 or its application notes suggests the sentencing judge is required to treat these mitigating role factors differently." *Id*. at 989–90.

Here, the court in fact identified the factors, and essentially adopted the arguments made by the government with respect to those factors. The court's discussion therefore reflects that it was aware of the factors and based its decision on them. At the sentencing hearing, the Assistant U.S. Attorney ("AUSA") addressed those factors and argued that they demonstrated that Tam was not substantially less culpable than the other participants. Addressing the defense arguments that Tam had been involved for a minimal amount of

time and involving a smaller amount of money, the AUSA
pointed out that all of the other couriers were involved for a
truncated period of time as was Tam, and that Tam was not
even the least culpable in terms of the amount of money laun-
dered. The AUSA then argued that the extent and nature of
Tam's involvement favored denying the adjustment, in that it
was ongoing for seven months, involving 15-20 pickups, and
that it went beyond merely the physical transfer of cash. The
AUSA pointed out that Tam went through an elaborate pro-
cess to engage in the secure transactions between the money
laundering organization in China and the drug trafficking or-
ganization in Mexico, including passing along the infor-
mation needed to conduct the secure transaction and transfer-
ring money to the brokers to conduct the mirror transactions,
thus involving himself in both sides of the transactions. The
AUSA also asserted that Tam understood the scope and struc-
ture of the organization, and knew funds were going through
China to launder money for the Mexican drug cartel. Finally,
the AUSA pointed out that he was profiting to the same extent
as his co-conspirators, receiving a percentage of the laun-
dered money as commission. Therefore, the AUSA discussed
the facts in the context of those factors and set forth why the
factors favored denial of the downward adjustment.

Immediately following that argument, the court began its
analysis by cycling through the elements, stating that the
AUSA "is correct regarding that fact-based determination, be-
cause we look to the degree to which he understood the scope
and structure, and he certainly did …," which was the first of
the factors. The court then continued the discussion, identify-
ing the other factors, mentioning "the degree to which he par-
ticipated in the planning," and then stating:

> [a]nd then, of course, the degree to which he ex-
> ercised authority or influenced the exercise and
> decision-making authority, the nature and ex-
> tent of his participation, and then whether he
> stood to benefit. And all of the factors that [the
> AUSA] just said really favor the enhancement
> being given. … I don't think the reduction is ap-
> propriate based upon the factual statements
> that [the AUSA] just made.

See Sent. Tr. at p5-9.

The court therefore recognized the factors that had to be considered and identified them explicitly. It then endorsed the facts set forth by the AUSA and the application of those factors, and determined that the downward adjustment was not warranted. The court was not required to restate the AUSA's argument in order for it to show that it considered the proper factors. The court explicitly noted the factors, and adopted the AUSA's factual arguments in agreeing with the AUSA that the adjustment was not proper here. The facts identified by the AUSA and adopted by the court support the determination to deny the minor role adjustment, and the court's factual findings and legal conclusions in denying the adjustment were not erroneous.

Accordingly, the decision of the district court is AFFIRMED.